UNITED STATES of America, Plaintiff–Appellee,

v.

Terry Erwin EYLER, Defendant–Appellant.

No. 93–30433.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1995.

Decided Oct. 5, 1995.

Mark A. Cross, Cross & McDonald, Portland, OR, for the defendant-appellant.

Deborah Dealy–Browning (argued), Frank Noonan, Assistant United States Attorneys, Portland, OR, for the plaintiff-appellee.

Before: CANBY, REINHARDT, and T.G. NELSON,* Circuit Judges.

REINHARDT, Circuit Judge:

Eyler was convicted by a jury of possession of unregistered machine guns and of

---

* Judge Tang was originally a member of this panel and heard argument in this case. He died prior to circulation of this opinion, and pursuant to General Order 3.2(g), Judge T.G. Nelson was drawn as a replacement. Judge Nelson was provided with a tape of the oral argument as well as the briefs and other materials received by the other members of the panel.

being a felon in possession of a firearm. He fully admitted his guilt on those charges. He appeals only from his sentence of 66 months imprisonment and from the conditioning of his supervised release upon repayment of the costs of his defense, in particular the attorneys fees paid to his court-appointed counsel under the Criminal Justice Act (CJA). We conclude that Eyler is entitled to a three-point rather than a two-point reduction for acceptance of responsibility, and that it was improper to condition his supervised release upon his repayment of attorneys fees. Accordingly, we remand for resentencing in accordance with this opinion.

## I. BACKGROUND

Terry Eyler and Harriett Crelling began living together in 1983. Although they have never married, they lived together in a family-type relationship along with Crelling's minor daughter Serena. In 1990, Crelling opened a craft shop in Hermiston, Oregon. At some point, she began on occasion to sell small amounts of methamphetamine out of her shop. Apparently, Eyler was unaware of these drug transactions. In 1992, government agents began investigating Crelling, and this investigation eventually led to the arrests of both Eyler and Crelling.

Subsequent to the arrests, law enforcement officers, acting pursuant to a warrant, searched the Eyler and Crelling residence and outbuildings, their boat, two storage lockers, and Crelling's craft shop. During the course of these searches, officers seized almost all of the couple's real and personal property. Among the items seized from defendants' home and storage locker were over 40 automatic or concealable weapons, explosives, small amounts of methamphetamine and marijuana, and over fifty-thousand dollars in cash. Shortly after their arrest, a magistrate appointed Crelling and Eyler counsel because, as a result of the seizure of nearly all of their property, the couple lacked the resources to obtain legal representation.[1]

Although both Eyler and Crelling were indicted for drug and weapons charges, they asserted that they did not bear collective criminal culpability for any of the charges. Rather, Eyler asserted that he was involved only in the illegal weapons offenses and that he had no involvement in Crelling's drug trafficking. Similarly, Crelling asserted that she was responsible for all of the drug conduct, and had no connection with any of the weapons offenses. The defendants entered into negotiations with the government shortly after their arraignment. Eyler offered to plead to the two firearms charges and Crelling offered to plead to the four drug distribution charges, but the government refused to limit its prosecution to those respective charges and insisted that all plea agreements must include a combination of both drug and weapons charges. The defendants were unwilling to agree to this, and the plea negotiations broke down.

Eyler pursued his same stance at trial. Although he consistently disclaimed any involvement in Crelling's drug trafficking, he fully admitted ownership and unlawful possession of the weapons. (TR Vol. 8, p. 47–53, 69–72, 114–15) Moreover, during closing argument, Eyler's counsel unequivocally stated that Eyler was guilty of the weapons charges—possession of unregistered machine-guns and felon in possession of a firearm. (TR Vol. 8, p. 87) The jury acquitted Eyler of all charges except for the weapons charges which he had consistently admitted. (ER 21.1)

Throughout the course of these proceedings—from the time of his arrest and throughout trial and sentencing—Eyler maintained that the reason he had large amounts of cash in his home, as well as an unusually large stash of somewhat exotic weapons, was his prior military involvement with the United States government and his current career as a mercenary. He contended that he was recruited in 1966 to carry out strategic operations in Vietnam and Southeast Asia (TR Vol. 6, p. 4–6). However, he produced no tangible evidence of his military involvement and record searches by the U.S. Naval Investigative Service and the Office of General Counsel of the Central Intelligence

---

**1.** Eventually through the assistance of friends and family, Crelling was able to procure retained counsel.

Agency failed to corroborate either his claim that he had served in the armed forces or that he had had some kind of employment or operational relationship with the CIA. He further asserted that a few years after the war ended, he began working as a mercenary in Central and South America. (TR Vol. 6, p. 93). At trial, he testified that he had earned nearly a half-million dollars in cash through his mercenary work. (TR Vol. 6, p. 93).

Eyler also testified that he and some of his mercenary colleagues had pooled certain resources in an investment account in Mexico, and that the primary purpose of this account was to provide financial support to family members of mercenaries who are killed or disappear. He estimated that his share of the account was worth approximately $125,-000.00. In subsequent court proceedings, he asserted that the account was restricted and that disbursements for the purpose of making payments to any agency or branch of any government were forbidden.

Following a court-ordered psychological evaluation, Eyler was diagnosed as suffering from Post Traumatic Stress Syndrome/Delayed Stress Syndrome (PTSS/DSS), which was determined to be the likely result of combat experience. (ER 26) Additionally, expert testimony, presented on Eyler's behalf, supported his claims of military involvement. Dr. Stanulis, a clinical psychologist trained in Veterans Hospitals, examined Eyler and concluded that his emotional and psychological problems were completely consistent with his claims of military experience. (ER 70, 79) Dr. Stanulis also noted that he had previously encountered military personnel who were involved in secret activities that could not be substantiated in official government documents.

At sentencing the district court granted Eyler a two-level downward adjustment under U.S.S.G. § 3E1.1(a) for acceptance of responsibility. However, it refused to grant

an additional one point downward adjustment under U.S.S.G. § 3E1.1(b)(1) or (2). The court reasoned that, first, the defense of the case was driven by Eyler and thus he did not accept responsibility in a way that ensured the certainty of his just punishment in a timely manner; and second, he did not exhibit the degree of openness and frankness indicative of remorse.

Although the government disputed all of Eyler's contentions regarding his prior military experience and his prior mercenary work,[2] the district court apparently credited these contentions at least for some sentencing purposes. After finding Dr. Stanulis to be credible and presuming Eyler's statements regarding his mercenary work to be true, the court concluded that Eyler had the ability to repay the government for counsel and court fees because of the existence of the secret Mexican mercenary fund. However, the court found Eyler's statement that the monies were not available for use in connection with debts to the government to be unconvincing. The court then ordered that as a condition of Eyler's supervised release he repay the CJA funds expended on his behalf within one year of his release from prison. The court specifically noted that failure to comply with this condition would result in Eyler's re-incarceration. At the time of sentencing, CJA expenditures totalled more than $30,000.00, and were expected to increase. (ER 153)

Aside from the disputed Mexican mercenary account, Eyler has few, if any, assets with which to satisfy the condition regarding repayment of CJA funds. The government continues to retain defendants' house and to pursue civil forfeiture of that property.[3] His other property was released, but IRS liens against that property total $260,996. Although there is no IRS activity as to the seized boat valued at $59,000, that vessel is in the name of Crelling's daughter Serena.[4]

2. Indeed, the government asserted that Eyler's testimony on these points amounted to perjury and that this perjured testimony should form the basis of an upward adjustment for obstruction of justice. The district court denied this request.

3. Appellant claims the house has diminished in value due to inadequate security and upkeep

since government seizure, but the District Court felt it unnecessary to address who may be responsible for the damage to the defendants' property. (ER 137)

4. Both Eyler and Crelling have previously filed notices of claim of ownership on the boat.

Eyler's only verifiable income consists of monthly payments of $1,250 and lump-sum payments of $10,000 every five years, which he receives as payment of a settlement for injuries incurred in a traffic accident in 1985. Due to a "spendthrift" clause in the settlement, the amounts cannot be paid faster than the schedule provides. Accordingly, the court did not consider these funds available to defendant for the purpose of repaying the CJA expenditures. It did note, however, that Eyler may have defenses against the forfeiture and IRS actions.

 Eyler appeals the District Court's refusal to grant the additional one point reduction in offense level and its conditioning of supervised release on his repayment of the CJA funds.[5]

## II. The Acceptance of Responsibility Reduction

Eyler challenges the district court's refusal to award him a third reduction point for acceptance of responsibility. Guideline 3E1.1(a) instructs the court to decrease the offense level by two points if the defendant "clearly demonstrates acceptance of responsibility." Under Guideline 3E1.1(b), the court is instructed to reduce the offense level by a third point if certain conditions are met. This guideline states:

> (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
>
> (1) timely providing complete information to the government concerning his own involvement in the offense; or
>
> (2) timely notifying authorities of his intention to enter a plea of guilty, thereby

permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,

> decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1(b).

It appears from the transcript of the sentencing hearing that the district court denied the additional reduction for primarily two reasons: 1) that although the defendant admitted to his participation in certain offenses, by allowing all of the charges to go to the jury, he retained the opportunity to win a complete acquittal; and 2) that the defendant had failed to satisfy the court that he had reached the degree of openness and frankness and assistance that is contemplated by the guidelines. [ER 116–18]. The court noted that the background notes to § 3E1.1 explain that a defendant who meets the requirements of § 3E1.1(b) "has accepted responsibility in a way that ensures the certainty of his just punishment in a timely manner." In the court's view, Eyler's conduct, while not precluding a 2–point reduction under § 3E1.1(a), was inconsistent with "ensuring the certainty of [ ] just punishment." Accordingly, the court denied the third point reduction.

 Before turning to the specifics of Eyler's case, we set forth a few of the underlying principles. First, if the requirements of § 3E1.1(b) are met, then the additional one point reduction is mandatory, and the district court does not have the discretion to decline to award it. *United States v. Colussi*, 22 F.3d 218, 219–20 (9th Cir.1994). Second, although § 3E1.1(b) is part of the "acceptance of responsibility" guideline, the measure of a defendant's contrition is generally irrelevant to the § 3E1.1(b) inquiry. While the key inquiry for purposes of section

---

5. Eyler also appeals the district court's refusal to grant a discretionary downward departure. Generally, a district court's refusal to grant a discretionary departure is not reviewable on appeal. *United States v. Morales*, 972 F.2d 1007, 1011 (9th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1665, 123 L.Ed.2d 283 (1993). An exception to this rule exists when the district court indicates that it believes that it lacks the authority to depart. *United States v. Reyes–Alvarado*, 963 F.2d 1184, 1189 (9th Cir.1992), *cert.* *denied*, — U.S. —, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992); *United States v. Mejia*, 953 F.2d 461, 465 (9th Cir.1991), *cert. denied*, 504 U.S. 926, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992). Here, the district court expressly stated that it knew it had the discretion under Guidelines 5K2.0, 5K2.11 and 5K2.13 to depart downward, but it believed that a departure was unwarranted. Because the court recognized its authority to depart, but simply refused to do so for specific reasons, its decision is not reviewable.

(a) is whether the defendant has demonstrated contrition, once this has been determined, then the focus of the section (b) inquiry is on *timeliness.* *See United States v. Narramore,* 36 F.3d 845, 847 (9th Cir.1994); *United States v. Hopper,* 27 F.3d 378, 384 (9th Cir.1994). As Comment Note 6 explains: "The timeliness of the defendant's acceptance of responsibility is a consideration under both subsections, and is context specific. In general, the conduct qualifying for a decrease in offense level under subsection (b)(1) or (2) will occur particularly early in the case." Third, the Guidelines 3E1.1(b)(1) and 3E1.1(b)(2) create two separate classes of cases in which defendants are entitled to receive the additional point reduction. Once the defendant has qualified for the initial two points under (a), then he is *entitled* to an additional one-point reduction if he meets *either* of the two section (b) requirements, regardless of whether he meets the other. *See Colussi,* 22 F.3d at 221; *United States v. Stoops,* 25 F.3d 820, 822 n. 1 (9th Cir.1994). The district court misperceived these principles and thereby committed legal error. While we ordinarily give great deference to the district judge's evaluation of a defendant's acceptance of responsibility (see U.S.S.G. § 3E1.1, comment note 5), we do not defer when an error of law underlies the court's determination.

■ Eyler argues that he qualifies for a (b)(1) reduction because from the moment of arrest, through the unsuccessful plea discussions and through his testimony at trial, he consistently and fully admitted to ownership, possession, and all relevant conduct associated with the weapons charges—the charges on which he was convicted. He also argues that he is entitled to the reduction under (b)(2) since it was not his fault that the government elected to go to trial. He argues that because of his stance prior to and at trial (full admission of weapons conduct), the government was relieved of any real burden of preparing for trial on those counts. Rather, he asserts, the government was free to concentrate its efforts on building a case for the drug offenses—offenses he did not commit. Because Eyler was acquitted of the drug charges, he argues that the government's efforts to convict him of them should not be held against him.

We need not consider the (b)(2) argument because Eyler clearly qualifies for a reduction under (b)(1). Under (b)(1), the focus is on the timeliness and completeness of the information regarding his own offense conduct that the defendant provides to the authorities. *See Stoops,* 25 F.3d at 822–23. In *Stoops,* the defendant argued that his day of arrest confessions entitled him to a (b)(1) reduction. The government argued that the defendant was not entitled to the additional reduction because the information he provided was readily available to the police without the confessions, and because the defendant subsequently attempted to suppress his confessions. We rejected those arguments noting that confessions ordinarily fulfill the purposes of the guidelines because they insure just punishment and obviate the need for further investigation thus greatly easing the burden of prosecution. *Id.* at 823 n. 3. Moreover, we reasoned, the fact that a defendant later attempts to suppress a confession is irrelevant to the (b)(1) inquiry because suppression does not bear on the timeliness of the confession but the timeliness of a guilt determination. If a defendant timely confesses, he has timely provided the complete information contemplated by (b)(1) regardless of any subsequent suppression motion. *Id.*

■ All that (b)(1) requires is that a defendant have "assisted authorities in the investigation . . . of his own misconduct by . . . timely providing complete information . . . concerning his own involvement in the offense." Eyler has clearly met these conditions. Throughout the course of the criminal proceedings, from very shortly after his arrest through trial and sentencing, Eyler consistently cooperated with the investigating officers, fully acknowledged his criminal liability for being a felon in possession of a firearm and possessing unregistered machine guns, and made efforts to plead to those charges. These are the only charges relevant to our analyses, for they are the only charges of which he was found guilty and for which he was properly sentenced. A defendant may not be punished, in the form of an increase in his guideline sentence or otherwise, for failing to provide information concerning his involvement in an offense of

which he has been acquitted. *Cf. United States v. Brady,* 928 F.2d 844, 850–52 (9th Cir.1991) (sentencing court not permitted to reconsider facts that have been rejected by a jury's not guilty verdict). Eyler's furnishing of information concerning his guilt on the weapons charges is indistinguishable from the day-of-arrest confession in *Stoops,* and, Eyler is entitled to the same (b)(1) reduction.

Moreover, the district court's reasons for denying a reduction have no bearing on the proper (b)(1) inquiry. The court suggested that the possibility of defendant's acquittal failed to ensure the *certainty* of just punishment. However, this is an overly rigid reading of "certainty." Again, *Stoops* is controlling. If Stoops had successfully suppressed his confessions, then this too would have failed to "ensure certainty of his just punishment." However, as we explained in *Stoops,* the focus of a (b)(1) inquiry is on whether the defendant *timely* provided complete information. Once such information is provided, then the (b)(1) requirements are met. *Id.* at 823. It does not matter that the government is subsequently compelled to try the case.

■ Further, a defendant is entitled to the reduction if he assists in either the investigation *or* the prosecution of his own criminal conduct. Although pre-trial motions or a refusal to plead may in some respect hinder the *prosecution* of an offense, such actions do not erase a defendant's assistance in *investigating* his own criminal conduct.

The second observation made by the district court potentially bears on the (b)(1) inquiry. The court suggested that Eyler was not as open and frank as he could have been. This could be read as suggesting that the information provided was not "complete." However, such a conclusion appears to be completely at odds with other factual findings made by the court. The court's comment seems to refer to Eyler's representations regarding his military/mercenary background. However, the judge's ruling regarding the conditioning of supervised release on the recoupment of CJA funds is premised on

the existence of the mercenary account in Mexico. Thus, for at least one important purpose, the district court chose to believe Eyler's mercenary story; therefore, the "open and frank" rationale is quite puzzling.

■ In any event, regardless of the truth of the mercenary/military related representations, Eyler's information must be considered "complete" for purposes of (b)(1) so long as he provided the requisite information regarding his relevant conduct with respect to the offenses of which he was convicted. Because any misrepresentations regarding his past service as a soldier or a soldier-for-hire would not affect his criminal liability, they are irrelevant for this purpose. *Cf. United States v. Gonzalez,* 16 F.3d 985, 990–91 (9th Cir.1993) (lying about motivations for conduct and lack of candor irrelevant to § 3E1.1 determination where the explanation was not made to avoid criminal liability).

The record reveals that Eyler made the equivalent of a day-of-arrest confession, and that he consistently accepted responsibility for the conduct related to his conviction throughout the relevant proceedings. Eyler's consistent position regarding the weapons charges had the practical effect of obviating the need for government authorities to investigate the weapons matter. His performance with regard to charges on which he was acquitted is irrelevant and may not be held against him. Accordingly, we vacate the sentence and remand for entry of an additional one point reduction under § 3E1.1(b)(1).

### III. Supervised Release Conditions: The CJA Recoupment Order

■ The district court imposed a three year term of supervised release to follow Eyler's sixty-six month term of imprisonment. The court conditioned Eyler's supervised release upon his repaying the government the CJA funds expended for his defense.[6] Eyler challenges this condition.

---

6. Title 18 U.S.C. § 3006A(f) reads in pertinent part:

> Whenever ... the court finds that funds are available for payment from or on behalf of a person furnished representation, it may autho-

rize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney....

The lawfulness of conditioning supervised release on repayment of attorneys fees appears to be an issue of first impression. However, some courts have addressed the issue in the context of probation. These courts have adopted conflicting positions based on different interpretations of the probation statute.[7] Although supervised release and probation are often treated similarly, they are distinct in status. Moreover, the range of permissible supervised release conditions is narrower than the range of permissible probation conditions. For example, a district court has the authority to impose probation conditions that are punitive in nature. The provision of just punishment is not a criterion for supervised release conditions. *Compare* 18 U.S.C. § 3563(b) *with* 18 U.S.C. § 3583(d)(1).[8] Accordingly, in order to determine the propriety of the district court's sentence, our inquiry must focus on the statutory provisions relating to supervised release.

The court's authority to set conditions of supervised release is governed by 18 U.S.C. § 3583(d). This provision sets out certain mandatory conditions of supervised release, and then states that a court may impose additional supervised release conditions that meet the following criteria. First, they must be reasonably related to the factors set forth in §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D). These factors are: consideration of "the nature and circumstance of the offense and the history and characteristics of the defendant;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed [training], medical care, or other correctional treatment in the most effective manner." Second, the conditions must involve no greater deprivation of liberty than is reasonably necessary for the latter three purposes. And third, the conditions must be consistent with pertinent policy statements of the Sentencing Commission.[9]

A condition that a defendant reimburse CJA expenditures does not meet these statutory criteria.[10] Any discretionary condition

---

7. Generally, the courts that have upheld conditions requiring the repayment of attorneys fees construed the relevant probation statute as giving the district court a wide measure of discretion to formulate specific conditions. *See United States v. Santarpio*, 560 F.2d 448, 455 (1st Cir.1977), *cert. denied*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977) (such a condition "might be thought to bear a reasonable relationship to the treatment of the accused and the protection of the public.") (internal quotation marks omitted); *United States v. Gurtunca*, 836 F.2d 283, 287 (7th Cir.1987) (sentencing judge has an exceptional degree of flexibility in determining probation conditions); *United States v. Allen*, 596 F.2d 227, 232 & n. 6 (7th Cir.1979), *cert. denied*, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 97 (1979) (same).

In contrast, the courts that have invalidated the conditions did so primarily because they interpreted the relevant probation statute more narrowly and concluded that the repayment of attorneys fees was not within the collection of permissible conditions. *See United States v. Turner*, 628 F.2d 461, 467 (5th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981); *United States v. Jimenez*, 600 F.2d 1172, 1174 (5th Cir.1979), *cert. denied*, 444 U.S. 903, 100 S.Ct. 216, 62 L.Ed.2d 140 (1979).

8. Both the probation statute (§ 3563) and the supervised release statute (§ 3583) state that discretionary conditions must be reasonably related to certain specified purposes of sentencing contained in 18 U.S.C. § 3553. A key difference between the probation statute and the supervised release statute is that the probation statute allows the imposition of discretionary conditions that are reasonably related to § 3553(a)(2)(A), while the supervised release statute does not. This provision states:

> ... The court, in determining the particular sentence to be imposed, shall consider [ ...] the need for the sentence imposed [ ...] to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> 18 U.S.C. § 3553(a)(2)(A).

9. Additionally, the Guidelines identify 25 recommended conditions of supervised release that meet the statutory requirements. See U.S.S.G. § 5B1.4. Restitution of CJA funds, improperly disbursed or not, is not among them.

10. While it might at one time have been possible to argue that recoupment falls under the category of "restitution" which is explicitly enumerated as an appropriate condition in the relevant statutes and guidelines, see U.S.S.G. § 5B1.4(b)(15), we have interpreted restitution as repayment of losses stemming *directly* from the defendant's criminal offense i.e. victim restitution. *See U.S. v. Tyler*, 767 F.2d 1350, 1351 (9th Cir.1985) (interpreting restitution under 18 U.S.C. § 3651). We cited with approval a Fourth Circuit case stating that "restitution" does not include the government's costs of investigating or prosecuting a case. *Id.* (citing *United States v. Vaughn*, 636 F.2d 921 (4th Cir.1980)).

must meet *each* of the three broad conditions set forth in 18 U.S.C. § 3583(d). However, the recoupment condition fails to satisfy the first—that the condition be "reasonably related" to the goals of rehabilitation, deterrence, protection of the public, and training or treatment. The recoupment order simply bears no relationship to any of these goals. It is not related to Eyler's underlying criminal conduct—unlawful possession of firearms—and has no rehabilitative effects. Nor does it further any deterrence goals, protect the public from future crimes, or provide Eyler with any training or treatment. Because this condition fails to satisfy the first requirement, it fails *a fortiori* to satisfy the second. Although it is highly doubtful that such a condition could satisfy the third requirement, there is no need to consider that question here.

The discretion of a district court to impose conditions of supervised release that it considers appropriate is limited by the express provisions of § 3583(d). A condition that a defendant repay CJA attorneys fees violates these provisions and, accordingly, exceeds the district court's authority.[11] Thus, we reverse the imposition of the condition of supervised release ordering recoupment of CJA funds.

Because we conclude that it was improper as a matter of law for the district court to condition supervised release on repayment of CJA attorneys fees, we need not address Eyler's argument that the district court erred in concluding that he had the ability to comply with the condition.

### CONCLUSION

For the foregoing reasons, we remand to the district court with instructions to afford a one point reduction under § 3E1.1(b)(1) and to recalculate Eyler's sentence accordingly. The district court is further instructed to strike the portion of Eyler's sentence that

conditions supervised release upon the repayment of CJA funds.

REMANDED for the *limited purpose* of resentencing in accordance with the above instructions.

---

**11.** We note that in addition to violating the express terms of the relevant statute, conditioning supervised release on repayment of attorneys fees is also inconsistent with the *Guidelines for the Administration of the Criminal Justice Act.* See 7 Guide To Judiciary Policies and Procedures at 20 (1990). Regarding CJA funds and payments by a defendant, these guidelines state:

> Subsection (f) of the Act does not authorize a judicial officer to require reimbursement as a

condition of probation, and the Judicial Conference believes that reimbursement of the cost of representation under the Act should not be made a condition of probation under any other authority.

*Id.* For purposes of these statements, we see no significant difference between probation and supervised release.