**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Walter R. TUCKER, III, Defendant–**
**Appellant.**

**No. 96–50321.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 1997.

Decided Jan. 13, 1998.

Karyn H. Bucur, Laguna Hills, California, for defendant-appellant.

Daniel Saunders, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.

Before: PREGERSON, D.W. NELSON, and HAWKINS, Circuit Judges.

PREGERSON, Circuit Judge:

Defendant-Appellant Walter R. Tucker, III appeals his jury convictions on seven counts of extortion and two counts of filing a false tax return. Tucker also appeals the twenty-seven month term of imprisonment imposed by the district court. On appeal, Tucker contends that: (1) insufficient evidence exists to support his extortion convictions; (2) the evidence presented by the government proved entrapment as a matter of law; (3) insufficient evidence exists to support his conviction for false statements in his tax return; and (4) the district court erred in believing that it lacked authority to impose a sentence with no prison term.

## BACKGROUND

The evidence, viewed in the light most favorable to the government, established the following:

In 1983, John Macardican formed and became the president of Compton Energy Systems ("CES"). CES was to build and operate a facility where refuse would be burned to make steam which, in turn, would be converted to electricity and sold to Southern California Edison. In June 1984, the Compton Planning Commission granted CES a conditional use permit. The City Council, however, reversed the Planning Commission's issuance of a permit. This vote effectively killed the CES project. Believing that the project had been defeated because he refused to pay bribes, Macardican filed a complaint with the FBI. The FBI investigation did not lead to any prosecutions.

In December 1989, Compton Planning Director Bob Gavin's secretary contacted Macardican to ask whether he was interested in reviving the CES project. After several meetings between Macardican and Tucker's father, then-Mayor Walter R. Tucker, Sr., Macardican agreed to renew the project.

In May 1990, the FBI recruited Macardican in connection with an investigation into political corruption in Compton. Macardican agreed to cooperate with the investigation and to wear a body recorder.

Tucker, a practicing attorney, was sworn in as Mayor of Compton on April 23, 1991.[1] On May 10, 1991, Macardican and Tucker were introduced and Tucker told Macardican, "We have to get together." On May 20, 1991, Bob Gavin, who was then working as a consultant to CES, had lunch with Tucker. After the meeting, Gavin told Macardican that Tucker "was very upset that [Macardican] hadn't participated or contributed to his running for mayor and that if he was going to support [the CES] project other arrangements would have to be made." Gavin told Macardican that those other arrangements were "probably going to be money."

On May 30, 1991, Macardican asked Tucker how to gain the support of the candidates in the upcoming run-off City Council elec-

---

**1.** Tucker was elected Mayor of Compton in a special election after his father passed away.

tions. Tucker told Macardican to "bet on both horses" and "help both [candidates] out." To prevent the other candidate from finding out that Macardican was paying the opposition, Tucker suggested that Macardican issue checks in another name. Tucker stated:

> And when, and when you need some help you know we remember our friends so, no problem. Uh, I think that would be the way to do it because ... if I were a businessman in that position looking to do business with the city, knowing that I'm standing to, to risk ... gaining or losing a multimillion dollar project ... I'd say here, here's some for you, and some for you. (Chuckling).

Macardican asked if he could pay politicians with "cash or green or some other way." Tucker replied, "I guess you'd have to approach that on a case by case basis and ... see what he's comfortable with." Near the end of the meeting, the following exchange occurred:

> TUCKER: But as you say I think it's just a question of, of doing the ground work and ... showing the support, letting people know that ... you support them and I think and they ... likewise say ... no problem. This is somebody that ... we wanna support.
>
> MACARDICAN: At some time in the future you're gonna have to send me a signal or direct me, uh, on ... how I can be supportive of you. I don't know how to do that....
>
> TUCKER: Okay, all right.
>
> MACARDICAN: This is the first time, I know you're, you gotta feel this out or feel me out and, and then you've gotta tell me so that I can do what I have to do. I, I don't know what to do.
>
> \* \* \* \* \* \*
>
> TUCKER: I'm, uh, I guess not unlike any other politician, uh, I just came off the campaign and you know have a debt to

retire. Uh, what I'm, uh, comfortable with is, and again it, it depends on how you like to do it, uh, it's probably to your and mine and the projects uh, benefit to not have uh, checks ...

> MACARDICAN: Absolutely.
>
> TUCKER: ... from you or, what's the name of the company that, that the project is?
>
> MACARDICAN: Uh, COMPTON ENERGY SYSTEMS.
>
> \* \* \* \* \* \*
>
> TUCKER:.... But I would be comfortable with, uh, check or checks uh in some other name. Uh, uh, that, that would be very comfortable with me.
>
> MACARDICAN: Okay.
>
> TUCKER: Uhm, as I say you know I have a ... relatively considerable debt. It's not ... that bad but uh whatever you can muster ... something in the area of ... maybe ten grand could help....

Macardican then told Tucker that "it's gonna be green because I don't know any other way to do it." Macardican stated, "I'll get it set up and then I'll do it on an on-going basis." Tucker then told Macardican, "you're doing the right thing" and that "you got an open ear here." [2]

In seven separate meetings over the next ten months, Tucker received $30,000 in payments from Macardican.[3] Those seven payments constitute the basis for the seven Hobbs Act counts on which the jury convicted Tucker. First, Tucker received $10,000 in exchange for his support and expected vote in favor of CES's conditional use project. Second, Tucker received $10,000 in exchange for an official letter to the school board, whose property CES sought to acquire for the project. Finally, Tucker received $10,000 in exchange for his vote in favor of an "exclusive negotiating agreement" granted by the City Council to CES.

---

**2.** Tucker contends that before the next formal meeting with Macardican, Tucker saw Macardican and sought to clarify their relationship. Tucker contends that he told Macardican: "[I]f it's going to be cash, then, you're going to need to pay me as a consultant to advise you to the school board." Because Macardican denied that this conversation ever took place, we need not

consider it. *See Evans v. United States,* 504 U.S. 255, 257, 112 S.Ct. 1881, 1884, 119 L.Ed.2d 57 (1992) (noting that following a guilty verdict, courts must "view[ ] the evidence in the light most favorable to the Government").

**3.** Each of those meetings was recorded on audio or videotape.

### The First $10,000 Payment: Counts 1, 2, 3, 5, and 6

#### Count 1

On June 26, 1991, Tucker met with Macardican at the CES office. Macardican handed Tucker $2,000 in cash and stated, "that plus ... the eight that we agreed on ... should secure your vote." Tucker replied, "We'll be friendly, definitely" and stated, "you did a smart thing this time. You approached it properly." Later that day, Macardican and Tucker had lunch.[4]

At lunch Macardican stated that he had previously paid a "significant amount of money" to a City Council member that "turned on [him]." Macardican asked Tucker, "You're not gonna disappoint me this time are you?" Tucker replied, "No." The next day, Tucker deposited $1,850 into his personal bank account.

#### Count 2

On July 16, 1991 Macardican and Tucker met again. Macardican asked Tucker whether it would cost as much to obtain the support of council member Omar Bradley. Tucker stated, "everybody has one vote. And, uh, you'd like to make sure ... that you have his vote." Macardican then gave Tucker $1,000 in cash and a postdated check for $1,000 with the payee line left blank.[5] Tucker then promised to lobby Councilmembers Omar Bradley and Bernice Woods in support of the CES project. Macardican told Tucker that he would pay Bradley "two thousand a month just exactly like you." Tucker replied, "Great." Tucker deposited the check into his personal bank account on July 30, 1991.

#### Count 3

On August 28, 1991, Macardican met with Tucker at the CES office. Macardican stated that he had met with Bradley but had been uncomfortable because Bradley did not respond to his hints about support. Macar-

dican stated, "I didn't wanna insult him because you know we're doing something that's not ... entirely right." Tucker stated that he would "pull [Bradley] aside" and talk with him. Macardican then paid Tucker another $1,000 cash. That same day, Tucker deposited $980 in cash into his personal bank account.

#### Count 5

On November 8, 1991, Tucker met Macardican outside the CES office. Macardican gave Tucker $1,000. Shortly thereafter, Tucker deposited $850 in cash into his personal bank account.

#### Count 6

On February 12, 1992, Tucker and Macardican met for lunch. They discussed Tucker's plan to run for Congress. Two days later, Macardican paid Tucker the remaining $4,000 from the original $10,000 promised. Shortly thereafter, Tucker deposited $3,200 in cash into his personal bank account.

### The Second $10,000 Payment: Count 7

At the February 12, 1992 meeting, Macardican told Tucker that the school board required a letter of support from the Council before they would consider a lease or purchase of school board property. Tucker stated, "So what type of help do you think you'd be able to give me on uh my campaign." Macardican asked Tucker how much he needed. Tucker responded, "if I could get ten, it'd be great." Macardican then told Tucker that he would comply but would not give the $10,000 as a campaign contribution. Macardican later reiterated, "I'm not giving [the money] for [a] campaign."

At the February 14 meeting, Tucker handed Macardican a draft of a letter to the school board. The draft was unsigned, not on letterhead, and Tucker did not give Macardican a copy. Macardican promised to

---

4. In the car on the way to the restaurant, Macardican could not activate his body recorder. Tucker testified that during that ride, he again clarified to Macardican that he could not guarantee his vote and was serving only as a consultant. The FBI agents monitoring the conversation and Macardican all testified that Tucker did not make such a statement. Because the panel must view

the evidence in the light most favorable to the prosecution, *see Evans*, 504 U.S. at 257, 112 S.Ct. at 1884, it need not consider Tucker's uncorroborated testimony.

5. An FBI Special Agent signed the check with an undercover name.

get Tucker the $10,000 by the end of the week.

On March 12, 1992, Tucker again met with Macardican. Macardican asked for, but did not receive, a copy of the letter to the school board. Macardican then gave Tucker $10,000 cash. Later that day, Tucker faxed Macardican the signed letter on official letterhead. Also on that same day, Tucker deposited $1,950 in cash into his personal bank account. The next day, Tucker made an additional $5,000 cash deposit.

### The Third $10,000 Payment: Count 8

On June 23, 1992, after Tucker won the Democratic primary for Congress in his district, Tucker telephoned Macardican and thanked him for his support. Tucker stated, "I got this campaign debt so anything you can do down the line to ... help me out as you're, as you're more solvent...."

On July 28, 1992, the City Council voted 3–2 to grant CES an exclusive negotiating agreement ("ENA"). The ENA gave CES the sole right to negotiate for a waste-to-energy project in Compton. Tucker voted in favor of the ENA.[6]

On July 31, 1992, Macardican met with Tucker and thanked Tucker for his vote in favor of the ENA. Macardican paid Tucker $10,000 in cash and stated, "I appreciate what you've done."[7] Shortly thereafter, Tucker deposited $5,000 in cash into his personal bank account. Tucker also made another $4,600 deposit into his personal bank account during this period. It is unclear whether Tucker made the second deposit in cash.

### Tax Returns

In his 1991 federal income tax return, Tucker reported $41,924 in total income, including $41,000 in salary that Tucker and his wife received. Tucker failed to report an additional $7,950 in income, including: $6,000 received from Macardican, $1,450 received from a personal injury attorney for a referral, and $500 received for legal services. Tucker signed his 1991 tax return under penalty of perjury.

In his 1992 federal income tax return, Tucker reported $38,662 in total income, including $36,000 in salary that Tucker and his wife received. Tucker failed to report an additional $50,545 in income, including: $24,000 received from Macardican and $25,545 in miscellaneous payments.

After the government initiated Tucker's criminal investigation, Tucker filed amended 1991 and 1992 tax returns. Tucker reported an additional $4,500 in income in his 1991 return and an additional $26,145 in income in his 1992 return. Tucker testified that, in response to a government subpoena, he searched files contained in boxes in his garage and discovered the need to file amended returns. Tucker also testified that he believed that private contributions given to him for his campaign expenses were not taxable income. Finally, Tucker testified that he did not report the $10,000 received from Macardican because he believed that it was a loan.

On August 11, 1994, a federal grand jury indicted Walter R. Tucker. On June 1, 1995, the grand jury returned a First Superseding Indictment. Counts one through ten of that indictment charged Tucker with extortion under color of official right in violation of 18 U.S.C. § 1951. Counts eleven and twelve charged Tucker with false statements in a tax return in violation of 26 U.S.C. § 7206(1). After a forty-three day trial, a jury found Tucker guilty on seven of the extortion counts[8] and on both false tax return counts. The district court sentenced Tucker to twenty-seven months imprisonment.

6. Tucker testified that before voting on the ENA, he disclosed his "consulting" relationship with CES to then-City Attorney Wes Fenderson. Tucker testified that Fenderson told him that no conflict of interest existed that would require Tucker to abstain from the vote. Because Fenderson died before trial, he could not testify. The prosecution, however, offered testimony from Compton City Manager Howard Caldwell. Caldwell testified that a council member would ordinarily be required to abstain from voting on any project in which he has a financial interest.

7. Tucker claims that, in an unrecorded conversation, he asked Macardican for a $10,000 personal loan. Tucker testified that the July 31 payment constituted the loan. Tucker admitted, however, that he never repaid the loan. Moreover, Macardican testified that the $10,000 payment was a payment for Tucker's vote on the ENA.

8. The district court declared a mistrial as to counts 4, 9, and 10 when the jury failed to reach a verdict on those counts.

Tucker timely appeals. We have jurisdiction under 28 U.S.C. § 1291.

## ANALYSIS

■ The standard of review for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also United States v. Jones,* 84 F.3d 1206, 1210 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996). We review the district court's ruling on a motion for acquittal de novo. *United States v. Bahena–Cardenas,* 70 F.3d 1071, 1072 (9th Cir.1995). We apply the same test as a challenge to the sufficiency of the evidence. *Id.*

■ We review an entrapment claim, as a matter of law, de novo. *United States v. Davis,* 36 F.3d 1424, 1430 (9th Cir.1994), *cert. denied,* 513 U.S. 1171, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995). We may not review a district court's discretionary refusal to depart from the Sentencing Guidelines. *United States v. Eyler,* 67 F.3d 1386, 1390 n. 5 (9th Cir.1995). If the district court indicates, however, that it lacked the discretion to depart, we review that determination de novo. *United States v. Brownstein,* 79 F.3d 121, 122 (9th Cir.1996).

## I. Hobbs Act Violations

The prosecution brought seven counts against Tucker under the Hobbs Act, 18 U.S.C. § 1951, which provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,-000 or imprisoned not more than twenty years, or both.

(b) As used in this section-

\* \* \* \* \* \*

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951 (1993).

Tucker, relying on the Supreme Court's decision in *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), contends that there is insufficient evidence to show that he made an explicit promise to trade his official action for money. The government contends, however, that it need not prove a *quid pro quo* because this case does not involve campaign contributions.

In *McCormick,* the Supreme Court held that in prosecutions for extortion under color of official right involving campaign contributions to a public official, the government must prove a *quid pro quo. McCormick,* 500 U.S. at 273–74, 111 S.Ct. at 1816–17. The Supreme Court stated that the receipt of campaign contributions violates the Hobbs Act "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273, 111 S.Ct. at 1816. The Supreme Court expressly failed to consider, however, "whether a *quid pro quo* requirement exists in [contexts other than campaign contributions], such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* at 274 n. 10, 111 S.Ct. at 1817 n. 10.

In *Evans,* another case involving a Hobbs Act conviction based on campaign contributions, the Supreme Court held: "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans,* 504 U.S. at 268, 112 S.Ct. at 1889. The Court stated that "the offense is completed at the time when the public official receives a payment in return for his *agreement* to perform specific official acts; *fulfillment* of the *quid pro quo* is not an element of the offense." *Id.* (emphasis added).[9]

---

**9.** In a concurring opinion, Justice Kennedy explained the *quid pro quo* requirement:

[A] public official violates § 1951 if he intends the payor to believe that absent payment

"Exactly what effect *Evans* had on *McCormick* is not altogether clear." *United States v. Blandford*, 33 F.3d 685, 695 (6th Cir.1994), *cert. denied*, 514 U.S. 1095, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995). The Supreme Court has not addressed whether the *quid pro quo* requirement applies to a public official's acceptance of payments other than campaign contributions. *See United States v. Collins*, 78 F.3d 1021, 1034 (6th Cir.) ("Whether or not there is a *quid pro quo* requirement in the non-campaign context is an issue that has not been directly addressed by the Supreme Court."), *cert. denied*, —— U.S. ——, 117 S.Ct. 189, 136 L.Ed.2d 127 (1996).

Almost all the circuits that have addressed this precise issue have held that the *quid pro quo* requirement applies to all Hobbs Act extortion prosecutions, not just to those involving campaign contributions. *See, e.g., Collins*, 78 F.3d at 1035; *United States v. Hairston*, 46 F.3d 361, 365 (4th Cir.), *cert. denied*, 516 U.S. 840, 116 S.Ct. 124, 133 L.Ed.2d 73 (1995); *United States v. Martinez*, 14 F.3d 543, 553 (11th Cir.1994); *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir.1993). *But see Blandford*, 33 F.3d at 695–97 (declining to apply *McCormick's quid pro quo* requirement to prosecutions involving non-campaign contributions).

Whether prosecutors must prove a *quid pro quo* in cases involving non-campaign contributions is an issue of first impression in our circuit. In *United States v. Freeman*, 6 F.3d 586, 594 (9th Cir.1993) (internal citation omitted), we required the government to prove a *quid pro quo* "[i]f the payments the Government alleges were extorted were made in the form of campaign contributions." *Freeman* did not address whether the *quid pro quo* requirement extended to cases that involve non-campaign contributions, like this one.

■ But even applying the *quid pro quo* requirement to non-campaign contributions, and viewing the evidence in the light most favorable to the government, there is more

than sufficient evidence of a *quid pro quo* to support the extortion convictions here. "[A] *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct." *Evans*, 504 U.S. at 274, 112 S.Ct. at 1893 (Kennedy, J., concurring). The government need not show an explicit agreement between Tucker and Macardican; the government need only show that Tucker received the payment "knowing that [it] was made in return for official acts." *Evans*, 504 U.S. at 268, 112 S.Ct. at 1889; *see also United States v. Coyne*, 4 F.3d 100, 114 (2d Cir.1993) ("[T]he government does not have to prove an explicit promise to perform a particular act made at the time of payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence-i.e., on behalf of the payor-as specific opportunities arise."). (internal citation omitted). In this case, viewing the evidence in the light most favorable to the prosecution, there is more than sufficient evidence to find that Tucker understood that the payments he received from Macardican were made in return for official acts.

### The First $10,000 Payment

■ Viewing the evidence in the light most favorable to the government, the government presented substantial evidence that Tucker knew that the first $10,000 payment, made in five installments, constituted an exchange for Tucker's promise to perform official acts. Specifically, the evidence revealed that Tucker received the money in exchange for his support of the CES project, his intervention with other council members on CES's behalf, and his vote for a conditional use permit when it came before the Council.

When Tucker and Macardican met, on May 30, 1991, they discussed the CES project and how it failed to get off the ground. Tucker suggested that Macardican let politicians know that Macardican supported them.

---

the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied. The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated

by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.

*Evans*, 504 U.S. at 274, 112 S.Ct. at 1892–93 (Kennedy, J., concurring).

When Macardican asked how he could be supportive of Tucker, Tucker replied that he had a campaign debt and that "maybe ten grand could help." Tucker also told Macardican not to put checks in the name of either Macardican or CES.

From this evidence, a rational jury could infer that Tucker sought money in exchange for his support for the CES project. This conclusion is further supported by the following evidence:

1. On June 26, 1991, Macardican gave Tucker $2,000 in cash stating, "that plus ... the eight that we agreed on ... should secure your vote." Tucker replied, "We'll be friendly, definitely" and stated, "you did a smart thing this time. You approached it properly."

2. On the same day, Macardican expressed concern that he had previously paid a "significant amount of money" to a City Council member that "turned on [him]." Macardican asked Tucker, "You're not gonna disappoint me this time are you?" Tucker replied, "No."

3. On July 16, 1991, when Macardican expressed reluctance to pay Bradley, Tucker stated, "everybody has one vote." Tucker also promised to lobby Bradley and Bernice Woods in support of the CES project.

4. Finally, on August 28, 1991, Macardican stated that Bradley did not respond to his hints about support. Tucker stated that he would "pull [Bradley] aside" and talk with him.

### The Second $10,000 Payment

■ Viewing the evidence in the light most favorable to the government, the government also presented substantial evidence that Tucker knew that the second $10,000 payment constituted an exchange for Tucker's official letter to the school board.

On February 12, 1992, Macardican told Tucker that the school board required a letter of support from the Council before they would consider a lease or purchase of school board property. Tucker stated, "So what type of help do you think you'd be able to give me on uh my campaign." Macardican asked Tucker how much he needed and Tucker responded, "if I could get ten, it'd be

great." Macardican then told Tucker that he would comply but would not give the $10,000 as a campaign contribution.

Two days later, Tucker handed Macardican a draft of a letter to the school board. The draft was unsigned, not on letterhead, and Tucker did not give Macardican a copy. Macardican promised to get Tucker the $10,000 by the end of the week. Finally, on March 12, 1992, Macardican gave Tucker $10,000 cash. Later that day, Tucker faxed Macardican the signed letter on official letterhead. Macardican testified that he understood that he had to pay $10,000 for the letter of support.

### The Third $10,000 Payment

■ Viewing the evidence in the light most favorable to the government, the government presented substantial evidence that Tucker knew that the third $10,000 payment constituted an exchange for Tucker's promise to vote for the ENA.

On June 23, 1992, after Tucker won the Democratic primary for Congress in his district, Tucker asked for help in retiring his campaign debt. On July 28, 1992, Tucker voted in favor of the ENA. Three days later, Macardican thanked Tucker for his vote, paid him $10,000 in cash, and stated, "I appreciate what you've done."

Tucker received a total of $30,000 to support the CES project and influence other council members, to write a letter to the school board, and to vote for the ENA. The evidence, viewed in the light most favorable to the government, clearly demonstrates that Tucker "obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 268, 112 S.Ct. at 1889.

### II. Entrapment

Tucker contends that the evidence presented at trial established entrapment as a matter of law. Tucker argues that the evidence shows that the government induced Tucker to commit the crimes and that Tucker had no predisposition to commit the crimes.

"There are two elements to the defense of entrapment: (1) government inducement of the crime and (2) the absence of predisposition on the part of the defendant." *Davis,* 36 F.3d at 1430. "Generally, 'the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused.'" *Id.* (quoting *Sherman v. United States,* 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958)). "It is inappropriate for an appellate court to determine whether a defendant was entrapped when such a determination would necessarily entail 'choosing between conflicting witnesses' and 'judging credibility.'" *Id.* (citing *Sherman,* 356 U.S. at 373, 78 S.Ct. at 821).

"To establish [inducement] as a matter of law, the defendant must point to undisputed evidence making it patently clear that [the government induced] an otherwise innocent person ... to commit the illegal act by trickery, persuasion, or fraud of a government agent." *United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986). "Where the government has induced an individual to break the law and the defense of entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime prior to first being approached by government agents." *Davis,* 36 F.3d at 1430.

In evaluating predisposition, we consider five factors: (1) the defendant's character and reputation; (2) whether the government initially suggested criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *See United States v. McClelland,* 72 F.3d 717, 722 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1448, 134 L.Ed.2d 567 (1996). "Although none of these five factors controls, the most important is the defendant's reluctance to engage in criminal activity." *Davis,* 36 F.3d at 1430. To prove the defendant's predisposition, the government can rely upon evidence occurring after the initial contact with a government agent. *See Jacobson v. United States,* 503 U.S. 540, 551, 112 S.Ct. 1535, 1541–42, 118 L.Ed.2d 174 (1992).

Tucker first contends that the government induced him to commit the crimes because Macardican initiated contact with Tucker and constantly pursued Tucker. Tucker's evidence, however, does not make it "patently clear" that the government induced Tucker to commit the crimes by "trickery, persuasion, or fraud of a government agent." *Smith,* 802 F.2d at 1124; *see also United States v. Simas,* 937 F.2d 459, 462 (9th Cir. 1991) (holding that "'repeated and persistent solicitation' or 'persuasion' which overcomes the defendant's reluctance" is necessary to demonstrate government inducement) (citation omitted).

Rather, the evidence reveals that the government did *not* induce Tucker. The evidence shows the following:

1. Tucker initiated contact with Macardican and told him, "We have to get together."

2. At his first meeting with Macardican, Tucker first mentioned paying off politicians, concealing campaign contributions, and having his own campaign debt retired.

3. Tucker stated that he would be "comfortable" receiving checks in the name of a third party.

4. Tucker encouraged Macardican to pay off council member Bradley because, as Tucker noted, "everybody has one vote."

Tucker's entrapment claim fails because he has not established government inducement. Even if Tucker could establish government inducement, under the five factors relevant to the defendant's predisposition, the prosecution has proved, beyond a reasonable doubt, that Tucker was predisposed to commit the crime before Macardican first approached him. *See Davis,* 36 F.3d at 1430.

Tucker contends that the government proved that Tucker was *not* predisposed to commit the crime. Tucker relies on Macardican's statement that when he first met Tucker at a fund-raiser in May 1991, Tucker did not demand money. Tucker also asserts that the government did not have a specific target in mind when it enlisted Macardican's assistance. Tucker's argument, however, ignores conflicting evidence that tends to show Tucker's predisposition to commit the crimes.

As noted, the most important factor is Tucker's lack of reluctance. *See Id.* Tucker expressed no reluctance during any of the audio and videotaped meetings. To the contrary, when Macardican asked how he could support Tucker, Tucker stated that he had campaign debt and that "ten grand" would be nice. Macardican told Tucker "it's gonna be green" and Tucker responded, "you're doing the right thing." After receiving the first $2,000 payment, Tucker responded, "We'll be friendly, definitely" and stated, "you did a smart thing this time." [10]

The other relevant factors also indicate that Tucker was predisposed to commit the crime. The government challenged Tucker's character and reputation. The government presented evidence showing that three years before Tucker became Mayor, he was terminated from his position with the district attorney's office and convicted of altering or falsifying a document in public office. *See United States v. Smith*, 924 F.2d 889, 898 (9th Cir.1991) (noting that "prior criminal record" is relevant to the defendant's predisposition).

Moreover, the government offered evidence that Tucker told Macardican to make campaign contributions through a third party to conceal the source of the contribution. Tucker admitted that he knew that such conduct was criminal. Finally, Tucker profited in the amount of $30,000 and deposited most of this money directly into his personal bank account.

Considering the relevant factors, the government presented sufficient evidence to show that Tucker was predisposed to commit these crimes.

### III. False Tax Returns

 To prove that Tucker violated 26 U.S.C. § 7206(1), the government must prove that he: (1) filed a return that was false as to a material matter; (2) signed the return under penalty of perjury; (3) did not believe that the return was true as to every material matter; and (4) willfully subscribed to the false return with the specific intent to violate the law. *See United States v. Hanson*, 2 F.3d 942, 945 (9th Cir.1993).

 "Proof of willfulness is essential to support a conviction under section 7206(1)." *United States v. Claiborne*, 765 F.2d 784, 797 (9th Cir.1985). "To prove willfulness, the Government must show that [the] defendant intended to violate the law or knew that his actions would do so." *Id.* The government "may base its proof of willfulness on circumstantial evidence indicating that the defendant knew or must have known that his returns were false." *Id.* at 798.[11]

 Tucker contends that the government presented insufficient evidence to sustain a conviction under § 7206(1) because the government failed to present sufficient evidence that he did not believe his tax returns were true and that he specifically intended to violate the tax laws. More precisely, Tucker argues that any income that he did not claim during 1991 and 1992 resulted from unintentional oversight, the unavailability of documentation, or his belief that the income was not taxable because Tucker contributed the money towards his campaign.

The evidence presented at trial reflects that for 1991, Tucker failed to report $7,950 in income, and that for 1992, Tucker failed to report $50,545 in income. Although Tucker later filed amended 1991 and 1992 tax returns, Tucker still failed to report $3,550 in income for 1991 and $24,400 in income for 1992. Tucker testified that he did not report the $10,000 received from Macardican because he believed that it was a loan. Tucker also testified that he believed that private contributions given to him for his campaign expenses were not taxable income.

The evidence adduced at trial, viewed in the light most favorable to the government, supports a finding beyond a reasonable doubt that Tucker willfully filed returns that he

---

**10.** *See Jacobson*, 503 U.S. at 551, 112 S.Ct. at 1541–42 (noting that the government can rely upon evidence occurring after the initial contact with a government agent).

**11.** Tucker does not dispute that he signed false returns under penalty of perjury. Tucker's signature on his return is sufficient to establish knowledge once it has been shown that the return was false. *See United States v. Crooks*, 804 F.2d 1441 (9th Cir.1986). Thus, the determinative issue is whether Tucker willfully subscribed to the false return with the specific intent to violate the law. *See Hanson*, 2 F.3d at 945.

knew were materially false with the intent to violate the law. *See Hanson,* 2 F.3d at 946. In conversations with Tucker, Macardican stated that he was not making a campaign contribution. Macardican also testified that the $10,000 payment that he made to Tucker was for a vote on the ENA, rather than a loan. Moreover, given that the unreported income for 1992—$50,545—was greater than Tucker's total income for that year—$38,-662—a jury could infer that Tucker intended to violate the tax laws and that he had not made an honest mistake. *See Claiborne,* 765 F.2d at 798 (noting that the government "may base its proof of willfulness on circumstantial evidence indicating that the defendant knew or must have known that his returns were false"). For these reasons, the government has presented sufficient evidence to sustain Tucker's conviction for filing false tax returns.

### IV. Failure to Depart Downward

A district court's discretionary refusal to depart from the Sentencing Guidelines is not reviewable on appeal. *United States v. Sablan,* 92 F.3d 865, 870 (9th Cir.1996). We may, however, review the district court's conclusion that it lacked authority to depart downward under the Guidelines. *United States v. Mendoza,* 121 F.3d 510, 513 (9th Cir.1997).

At sentencing, Tucker requested community service as his sentence. The district court stated that "if it were up to the Court, *if the Court had that authority,* based upon this sentence, to permit him to serve it in the community, the Court would feel that he is an appropriate candidate to serve that sentence in the community." The district court stated further: "Based upon the guideline range of this sentence, the court does not have the option to impose probation or any community type placement that would permit the defendant to reside in the community, as opposed to in prison." The district court then sentenced Tucker to twenty-seven months imprisonment.[12]

Because the district court stated that it would depart downward and impose no prison term if it "had that authority," the district court apparently believed it lacked legal authority to depart downward. Thus, we have jurisdiction to consider Tucker's claim. *See Mendoza,* 121 F.3d at 513. "The Sentencing Guidelines allow for a downward departure in the atypical case where a guideline literally applies but where the defendant's conduct significantly differs from the norm or the 'heartland' of cases." *United States v. Eaton,* 31 F.3d 789, 793 (9th Cir. 1994) (citations omitted). Tucker argues that the district court had legal authority to depart downward because his case fell outside the Sentencing Guidelines' "heartland."

Tucker's claim fails, however, for two reasons. First, Tucker did not raise this issue before the district court. *See United States v. Quesada,* 972 F.2d 281, 283–84 (9th Cir. 1992) (noting that the defendant waived a claim for a downward departure by failing to raise it in the district court). Second, Tucker offers no reason why his case "differs from the norm or the 'heartland' of cases." *Eaton,* 31 F.3d at 793.

To the extent Tucker contends that his case falls outside of the "heartland" based on imperfect entrapment or extraordinary citizenship, the district court declined to depart downward on those claims and this court has no jurisdiction to review that decision. *See Sablan,* 92 F.3d at 870 (holding that a district court's discretionary refusal to depart downward is unreviewable). Tucker primarily argues that the district court's dissatisfaction with the sentence required under the Guidelines demonstrates that the district court felt that his case fell outside the heartland. The district court's dissatisfaction with the required sentence, however, is not a valid basis for departure. *See* U.S.S.G. § 5K2.0, commentary at 350 (1997). ("[D]issatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range."); *United States v. Cervantes Lucatero,* 889 F.2d 916, 918 (9th Cir.1989).

Because Tucker never raised this issue before the district court and Tucker fails to

---

12. The district court imposed this sentence by calculating Tucker's base offense level at 18 with a Criminal History category of I. This gave Tucker a sentencing range from 27–33 months.

offer any reason why his case falls outside the heartland of the Sentencing Guidelines, we affirm the sentence imposed by the district court.

## CONCLUSION

For the reasons stated above, we affirm Tucker's convictions and sentence.

AFFIRMED.