**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Shawn GEMENTERA, Defendant–Appellant.**

**No. 03–10103.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 2004.

Filed Aug. 9, 2004.

Arthur K. Wachtel, San Francisco, CA, argued the case for the appellant and was on the briefs. Maitreya Badami was also on the briefs.

Kelley Brooke Snyder, U.S. Department of Justice, Washington, DC, argued the case for the appellee and was on the briefs. Kevin Ryan, United States Attorney, and Hannah Horsley and Anne–Christine Massullo, Assistant United States Attorneys, were also on the briefs.

Elizabeth M. Falk, Office of the Federal Public Defender, San Francisco, CA, argued the case for amicus curiae Federal Public Defender for the Northern District of California and was on the briefs. Barry J. Portman, Federal Public Defender, was also on the briefs.

Before: O'SCANNLAIN, SILER, JR.,[*] and HAWKINS, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide the legality of a supervised release condition that requires a convicted mail thief to spend a day standing outside a post office wearing a signboard stating, "I stole mail. This is my punishment."

## I

Shawn Gementera pilfered letters from several mailboxes along San Francisco's Fulton Street on May 21, 2001. A police officer who observed the episode immediately detained Gementera and his partner in crime, Andrew Choi, who had been stuffing the stolen letters into his jacket as Gementera anxiously kept watch. After indictment, Gementera entered a plea agreement pursuant to which he pled guilty to mail theft, see 18 U.S.C. § 1708, and the government dismissed a second count of receiving a stolen U.S. Treasury check. See 18 U.S.C. § 641.

The offense was not Gementera's first encounter with the law. Though only twenty-four years old at the time, Gementera's criminal history was lengthy for a man of his relative youth, and it was growing steadily more serious. At age nineteen, he was convicted of misdemeanor criminal mischief. He was twice convicted at age twenty of driving with a suspended license. At age twenty-two, a domestic dispute led to convictions for driving with a suspended license and for failing to provide proof of financial responsibility. By twenty-four, the conviction was misdemeanor battery. Other arrests and citations listed in the Presentence Investigation Report included possession of drug paraphernalia, additional driving offenses (most of which involved driving on a license suspended for his failure to take chemical tests), and, soon after his twenty-fifth birthday, taking a vehicle without the owner's consent.

On February 25, 2003, Judge Vaughn Walker of the United States District Court for the Northern District of California sentenced Gementera. The U.S. Sentencing Guidelines range was two to eight months incarceration; Judge Walker sentenced Gementera to the lower bound of the range, imposing two months incarceration and three years supervised release.[1] He also imposed conditions of supervised release.

One such condition required Gementera to "perform 100 hours of community service," to consist of "standing in front of a postal facility in the city and county of San Francisco with a sandwich board which in large letters declares: 'I stole mail. This is my punishment.' "[2] Gementera later filed a motion to correct the sentence by

[*] The Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

1. The court explained that, while it would have been strongly inclined to impose home confinement had Gementera's criminal history been better, the court felt that "given the unpromising road that the defendant has been following, that he needs to have a taste of federal custody, to be sure a brief one, but he needs to understand that if he continues on the course that he has set for himself at his age he's going to be facing a lot more serious charges in the future."

2. At sentencing, the judge addressed Gementera: "[W]e've also discussed the fact that you need to be reminded in a very graphic way of exactly what the crime you committed means to society. That is, the idea of you standing out in front of a post office with a board labeling you as somebody who has stolen

removing the sandwich board condition. *See* Fed.R.Crim.P. 35(a).

Judge Walker modified the sentence after inviting both parties to present "an alternative form or forms of public service that would better comport with the aims of the court." In lieu of the 100–hour signboard requirement, the district court imposed a four-part special condition in its stead. Three new terms, proposed jointly by counsel, mandated that the defendant observe postal patrons visiting the "lost or missing mail" window, write letters of apology to any identifiable victims of his crime, and deliver several lectures at a local school.[3] It also included a scaled-down version of the signboard requirement:

> The defendant shall perform 1 day of 8 total hours of community service during which time he shall either (i) wear a two-sided sandwich board-style sign or (ii) carry a large two-sided sign stating, "I

stole mail; this is my punishment," in front of a San Francisco postal facility identified by the probation officer. For the safety of defendant and general public, the postal facility designated shall be one that employs one or more security guards. Upon showing by defendant that this condition would likely impose upon defendant psychological harm or effect or result in unwarranted risk of harm to defendant, the public or postal employees, the probation officer may withdraw or modify this condition or apply to the court to withdraw or modify this condition.

On March 4, 2003, the court denied the Rule 35 motion and amended the sentence as described above. Gementera timely appealed.[4]

## II

■ We first address Gementera's argument that the eight-hour sandwich

---

mail." Gementera replied, "If that's the case, I would stand in front of a post office with a board as my penalty for the crime that I did commit. And as long as I can get home detention so I can get my family back together, get back on track and rehabilitation myself." After the court imposed incarceration, rather than home detention, Gementera's counsel asked that the 100 hours be changed to "up to 100 hours at the discretion of the probation officer." That request was denied. Though the court had acknowledged explicitly that the condition would cause humiliation, Gementera did not challenge the condition's legality nor did he ask the court to explain or elaborate its purpose at the first hearing.

3. The first three parts of the four-part special condition mandated:
   a. The defendant shall, at the direction of the probation officers, spend 4 days of 8 total hours each at a postal facility where there is a lost and found window, observing postal patrons who visit that window to inquire about lost or missing mail;
   b. The defendant shall, with the assistance of counsel, carefully examine all Rule 16 discovery materials in the possession of the

United States to determine the identity of all ascertainable victims of the defendant's crime; having identified those persons, the defendant shall compose and address a personal letter to each of these persons individually expressing defendant's remorse for the specific conduct that harmed that person; the defendant shall provide each such victim with the address of his counsel, through whom any victim who wishes to contact the defendant directly may do so. c. The defendant shall deliver three educational lectures at three San Francisco high schools, to be identified by the probation officer and under the probation officer's direction, in which the defendant shall describe the crime he has committed, express his remorse for his criminal conduct and articulate to the students in attendance how his conviction and sentence have affected his life and future plans.

4. Gementera was ordered to surrender on March 31, 2003. On March 12, 2003, prior to his surrender, Gementera was arrested for possession of stolen mail, for which he was convicted and received a twenty-four month sentence.

board condition violates the Sentencing Reform Act.[5] *See* 18 U.S.C. § 3583(d).

■ The Sentencing Reform Act affords district courts broad discretion in fashioning appropriate conditions of supervised release, while mandating that such conditions serve legitimate objectives. In addition to "any condition set forth as a discretionary condition of probation in section 3563(b)(1) through (b)(10) and (b)(12) through (b)(20)," the statute explicitly authorizes the court to impose "*any other condition it considers to be appropriate.*" 18 U.S.C. § 3583(d)(emphasis added). Such special conditions, however, may only be imposed "to the extent that such condition—

(1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)";

18 U.S.C. 3583(d). Thus, to comply with this requirement, any condition must be "reasonably related" to "the nature and circumstances of the offense and the history and characteristics of the defendant." *See* 18 U.S.C. 3553(a)(1). Moreover, it must be both "reasonably related" to and "involve no greater deprivation of liberty than is reasonably necessary" to "afford adequate deterrence to criminal conduct," *see id.* at 3553(a)(2)(B), "protect the public from further crimes of the defendant," *see id.* at 3553(a)(2)(C), and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See id.* at 3553(a)(2)(D).[6] Accordingly, the three legitimate statutory purposes of deterrence, protection of the public, and rehabilitation frame our analysis. *E.g., United States v. Rearden,* 349 F.3d 608, 618 (9th Cir.2003); *United States v. T.M.,* 330 F.3d 1235, 1240 (9th Cir. 2003).[7]

Within these bounds, we have recognized the flexibility and considerable discretion the district courts exercise to impose conditions of supervised release, up to and including limits upon the exercise of

---

**5.** The court generally reviews supervised release conditions for abuse of discretion, *see United States v. Williams,* 356 F.3d 1045, 1052 (9th Cir.2004), though we review de novo the interpretation of the Sentencing Guidelines, *see United States v. Garcia,* 323 F.3d 1161, 1164 (9th Cir.2003), and "[w]hether the sentence imposed was 'illegal,' " *see United States v. Fowler,* 794 F.2d 1446, 1449 (9th Cir.1986), for example, by exceeding "the permissible statutory penalty for the crime[ ] or [by being] in violation of the Constitution." *United States v. Johnson,* 988 F.2d 941, 943 (9th Cir.1993).

**6.** Any condition must also be consistent with the Sentencing Commission's policy statements. *See* 18 U.S.C. § 3583(d); 28 U.S.C. § 994(a). The parties have not raised arguments with respect to this requirement.

**7.** Though the statutory authorities underlying conditions of probation and supervised release are distinct, *compare* 18 U.S.C. § 3583(authorizing supervised release conditions) *with* 18 U.S.C. § 3563(authorizing probation conditions), the court's supervised release jurisprudence has often relied upon authority from the probation context. *See, e.g., United States v. Hurt,* 345 F.3d 1033, 1035 (9th Cir.2003); *United States v. Pinjuv,* 218 F.3d 1125, 1131 (9th Cir.2000); *United States v. Bee,* 162 F.3d 1232, 1234–35 (9th Cir.1998). In that context, the court probes the extent to which probation conditions serve the "dual objectives of rehabilitation and public safety." *See United States v. Consuelo–Gonzalez,* 521 F.2d 259, 265 (9th Cir. 1975) (en banc).

fundamental rights. *See* 18 U.S.C. § 3583(d) (granting authority to impose "any other condition it considers to be appropriate"); *United States v. Hurt*, 345 F.3d 1033, 1036 (9th Cir.2003) ("[T]he district court . . . has wide discretion to act in the interest of the defendant and the public."); *United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir.1991) ("The sentencing judge has broad discretion in setting probation conditions, including restricting fundamental rights."). This reflects, in part, their greater knowledge of and experience with the particular offenders before them. We have, for example, upheld conditions barring possession of sexually stimulating material, *United States v. Bee*, 162 F.3d 1232, 1234 (9th Cir.1998), contact with minors, *id.*, association or membership in "motorcycle clubs," *Bolinger*, 940 F.2d at 480, and access to the internet, *Rearden*, 349 F.3d at 620.

■ Of course, the district court's discretion, while broad, is limited—most significantly here, by the statute's requirement that any condition reasonably relate to a legitimate statutory purpose.[8] "This test is applied in a two-step process; first, this court must determine whether the sentencing judge imposed the conditions for permissible purposes, and then it must determine whether the conditions are reasonably related to the purposes." *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir.1988). Gementera's appeal implicates both steps of the analysis.

## A

Gementera first urges that the condition was imposed for an impermissible purpose of humiliation. *See* 18 U.S.C. § 3553(a). He points to certain remarks of the district court at the first sentencing hearing:

[H]e needs to understand the disapproval that society has for this kind of conduct, and that's the idea behind the humiliation. And it should be humiliation of having to stand and be labeled in front of people coming and going from a post office as somebody who has stolen the mail.

According to Gementera, these remarks, among others, indicate that the district court viewed humiliation as an end in itself and the condition's purpose.

■ Reading the record in context, however, we cannot but conclude that the district court's stated rationale aligned with permissible statutory objectives. At the second sentencing hearing, when the sentence was amended to what is now before us, the court explained: "[U]ltimately, the objective here is, one, to deter criminal conduct, and, number two, to rehabilitate the offender so that after he has paid his punishment, he does not reoffend, and a public expiation of having offended is, or at least it should be, rehabilitating in its effect." Although, in general, criminal punishment "is or at least should be humiliating," the court emphasized that "[h]umiliation is not the point." The court's

**8.** Gementera points to several cases in which our sister circuits found that conditions did not reasonably relate. *See United States v. Abrar*, 58 F.3d 43 (2d Cir.1995) (repayment of unrelated debts); *United States v. Prendergast*, 979 F.2d 1289 (8th Cir.1992) (abstinence from alcohol for wire fraud conviction); *United States v. Smith*, 972 F.2d 960, 961–62 (8th Cir.1992) (not siring children except by wife for a narcotics conviction); *Fiore v. United States*, 696 F.2d 205, 208–10 (2d Cir.1982) (making reparations for crime to which only a co-defendant had pled guilty). He also cites *Springer v. United States*, 148 F.2d 411, 415–16 (9th Cir.1945), in which this court vacated a condition that a convicted draft-dodger donate a pint of blood to the Red Cross. *Id.* In each of these cases, however, the condition was unrelated to the nature and substance of the offense. Here, there is no reasonable dispute that the signboard declaration is related to the offense.

written order similarly stresses that the court's goal was not "to subject defendant to humiliation for humiliation's sake, but rather to create a situation in which the public exposure of defendant's crime and the public exposure of defendant to the victims of his crime" will serve the purposes of "the rehabilitation of the defendant and the protection of the public."

The court expressed particular concern that the defendant did not fully understand the gravity of his offense. Mail theft is an anonymous crime and, by "bring[ing] home to defendant that his conduct has palpable significance to real people within his community," the court aimed to break the defendant of the illusion that his theft was victimless or not serious. In short, it explained:

> While humiliation may well be—indeed likely will be—a feature of defendant's experience in standing before a post office with such a sign, the humiliation or shame he experiences should serve the salutary purpose of bringing defendant in close touch with the real significance of the crime he has acknowledged committing. Such an experience should have a specific rehabilitative effect on defendant that could not be accomplished by other means, certainly not by a more extended term of imprisonment.

Moreover, "[i]t will also have a deterrent effect on both this defendant and others who might not otherwise have been made aware of the real legal consequences of engaging in mail theft."

Read in its entirety, the record unambiguously establishes that the district court imposed the condition for the stated and legitimate statutory purpose of rehabilitation and, to a lesser extent, for general deterrence and for the protection of the public. *See* 18 U.S.C. § 3553(a); *see generally United States v. Clark*, 918 F.2d 843, 848 (9th Cir.1990) (affirming public apology condition when "[t]he record supports the conclusion that the judge imposed the requirement of a public apology for rehabilitation."), *overruled on other grounds by United States v. Keys*, 133 F.3d 1282 (9th Cir.1998) (en banc). We find no error in the condition's purpose.

**B**

Assuming the court articulated a legitimate purpose, Gementera asserts, under the second prong of our test, *see Terrigno*, 838 F.2d at 374, that humiliation or so-called "shaming" conditions are not "reasonably related" to rehabilitation. In support, he cites our general statements that conditions must be reasonably related to the statutory objectives, *see Consuelo–Gonzalez*, 521 F.2d at 262 ("[E]ven though the trial judge has very broad discretion in fixing the terms and conditions of probation, such terms must be reasonably related to the purposes of the Act."), several state court decisions,[9] and several law re-

---

9. In *People v. Hackler*, 13 Cal.App.4th 1049, 16 Cal.Rptr.2d 681 (Cal.Ct.App.1993), a California court vacated a condition requiring a defendant during his first year of probation to wear a t-shirt whenever he was outside his home. The t-shirt read, "My record plus two-six packs equal four years," and on the back, "I am on felony probation for theft." Noting with disapproval the trial court's stated intention of "going back to some extent to the era of stocks" and transforming the defendant into "a Hester Prin [sic]," *id.* at 1058, 16 Cal.Rptr.2d 681, the court held that the t-shirt could not serve the rehabilitative purpose because it would render the defendant unemployable. By contrast, Gementera's condition was sharply limited temporally (eight hours) and spatially (one post office in a large city), eliminating any risk that its effects would similarly spill over into all aspects of the defendant's life. Indeed, the district court's imposition of the condition in lieu of lengthier incarceration enables Gementera to enter the private labor market.

view articles that were not presented to the district court.

### 1

In evaluating probation and supervised release conditions, we have emphasized that the "reasonable relation" test is necessarily a "very flexible standard," and that such flexibility is necessary because of "our uncertainty about how rehabilitation is accomplished." *Id.* at 264. While our knowledge of rehabilitation is limited, we have nonetheless explicitly held that "a public apology may serve a rehabilitative purpose." *Clark,* 918 F.2d at 846; *see also Gollaher v. United States,* 419 F.2d 520, 530 (9th Cir.1969) ("It is almost axiomatic that the first step toward rehabilitation of an offender is the offender's recognition that he was at fault."). Of course, for Gementera to prevail, introducing mere

uncertainty about whether the condition aids rehabilitation does not suffice; rather, he must persuade us that the condition's supposed relationship to rehabilitation is unreasonable.

We considered a similar question in *Clark,* a case involving two police officers convicted of perjury in a civil rights lawsuit they brought against their department. *Clark,* 918 F.2d at 844. In a deposition, the officers lied about a past episode in which they had falsely phoned in sick while actually en route to a vacation. As a probation condition, the court required them to publish a detailed apology in the local newspaper and in the police department newsletter. *Id.* at 845. Though they challenged the condition based upon the First Amendment, we applied the same test applicable here, concluding that "[b]e-

---

*People v. Johnson,* 174 Ill.App.3d 812, 124 Ill.Dec. 252, 528 N.E.2d 1360 (1988), involved a condition that a DWI offender publish a newspaper advertisement with apology and mug shot. Interpreting the state supervision law as intended "to aid the defendant in rehabilitation and in avoiding future violations," and for no other purpose, the court held that the publication requirement "possibly, adds public ridicule as a condition" of supervision and could inflict psychological harm that disserves the goal of rehabilitation. *Id.* at 1362 (noting that the Illinois statute does not "refer to deterrent to others"). Relying on the fact that defendant was a young lady and a good student with no prior criminal record, had injured no one, and otherwise had no alcohol or drug problem, it found the condition impermissible, given the perceived mental health risk. *Id.* By contrast, we have specifically held that mandatory public apology may be rehabilitative. *Clark,* 918 F.2d at 848 ("[A] public apology may serve a rehabilitative purpose."). Moreover, the condition specifically provided that the signboard requirement would be withdrawn if the defendant showed that the condition would inflict psychological harm. ·

The defendant's third case, *People v. Letterlough,* 86 N.Y.2d 259, 631 N.Y.S.2d 105, 655 N.E.2d 146 (1995), also involved a probation condition imposed upon a DWI offender. If he regained driving privileges, the offender was required to affix a fluorescent sign to his license plate, stating "CONVICTED DWI". *Id.* at 147. The court imposed the condition under a catch-all provision of the New York law authorizing "any other conditions reasonably related to his [or her] rehabilitation." *Id.* at 148 (quoting New York Penal Laws § 65.10[2][l] ). Under the New York statute, rehabilitation "in the sense of that word that distinguishes it from the societal goals of punishment or deterrence" was the "singular focus of the statute." *Id.* at 149. Because the condition's "true design was not to advance defendant's rehabilitation, but rather to 'warn the public' of the threat presented by his presence behind the wheel," *id.* at 149, the court voided the condition. *Id.* at 159, 631 N.Y.S.2d 105, 655 N.E.2d 146; *see also id.* at 149 ("[P]ublic disclosure of a person's crime, and the attendant humiliation and public disgrace, has historically been regarded strictly as a form of punishment." (internal citations omitted)). In contrast to the New York scheme, the district court made plain the rehabilitative purpose of the condition. We also note that in the federal system, unlike the New York system, rehabilitation is not the sole legitimate objective. *See* 18 U.S.C. §§ 3583(d), 3553(a).

cause the probation condition was reasonably related to the permissible end of rehabilitation, requiring it was not an abuse of discretion." *Id.* at 848.

Both *Clark* and *Gementera* involve defendants who seemingly failed to confront their wrongdoing, and the defendants in each case faced public expiation and apology. In *Clark*, the defendants had neither admitted guilt nor taken responsibility for their actions. *Id.* at 848. Here, by contrast, the defendant pled guilty. His plea decision is unremarkable, though, given that he had been apprehended red-handed. Reflecting upon the defendant's criminal history, the court expressed concern that he did not fully understand the consequences of his continued criminality, and had not truly accepted responsibility.[10] The court explained:

> [T]his is a young man who needs to be brought face-to-face with the consequences of his conduct. He's going down the wrong path in life. At age 24, committing this kind of an offense, he's already in a criminal history category 4, two-thirds of the way up the criminal history scale. He needs a wake-up call.

The court also determined that Gementera needed to be educated about the seriousness of mail crimes in particular, given that they might appear to be victimless:

> One of the features of Mr. Gementera's offense is that he, unlike some offenders did not, by the very nature of this offense, come face-to-face with his victims. He needs to be shown that stealing mail has victims; that there are people who depend upon the integrity and security of the mail in very important ways and

that a crime of the kind that he committed abuses that trust which people place in the mail. He needs to see that there are people who count on the mails and integrity of the mails. How else can he be made to realize that than by coming face-to-face with people who use the postal service? That's the idea.

As with *Clark*, the district court concluded that public acknowledgment of one's offense—beyond the formal yet sterile plea in a cloistered courtroom—was necessary to his rehabilitation.

### 2

It is true, of course, that much uncertainty exists as to how rehabilitation is best accomplished. *See Consuelo–Gonzalez*, 521 F.2d at 264. Were that picture clearer, our criminal justice system would be vastly different, and substantially improved. By one estimate, two-thirds of the 640,000 state and federal inmates who will be released in 2004 will return to prison within a few years. *The Price of Prisons*, N.Y. Times, June 26, 2004, at A26. *See* Bureau of Justice Statistics, Dep't of Justice, *Recidivism of Prisoners Released in 1994* (2002) (finding 67.5% recidivism rate among study population of 300,000 prisoners released in 1994). The cost to humanity of our ignorance in these matters is staggering.

Gementera and amicus contend that shaming conditions cannot be rehabilitative because such conditions necessarily cause the offender to withdraw from society or otherwise inflict psychological damage, and they would erect a per se bar against such conditions.[11] *See* Toni Massaro, *Shame, Culture, and American Criminal Law*, 89

---

**10.** Gementera's post-sentencing, pre-surrender conviction for possession of stolen mail confirms the reasonableness of the district court's observation in this respect. For that conviction, Gementera was sentenced to twenty-four months imprisonment.

**11.** Even if shaming conditions were sometimes rehabilitative, Gementera also urges that the condition would be psychologically damaging in his specific case, given his "lack of coping skills, his substance abuse, and his unresolved personal issues with his father."

Mich. L.Rev. 1880, 1920–21 (1991) ("When it works, it redefines a person in a negative, often irreversible way" and the "psychological core" it affects cannot thereafter be rebuilt.); *see generally* June Price Tagney et al., *Relation of Shame and Guilt to Constructive Versus Destructive Responses to Anger Across the Lifespan,* 70 J. Psych. & Soc. Psych. 797–98 (1996); June Price Tagney et al., *Shamed into Anger? The Relation of Shame and Guilt to Anger and Self-Reported Aggression,* 62 J. Psych & Soc. Psych. 669–675 (1992). Though the district court had no scientific evidence before it, as Gementera complains, we do not insist upon such evidence in our deferential review.[12] Moreover, the fact is that a vigorous, multifaceted, scholarly debate on shaming sanctions' efficacy, desirability, and underlying rationales continues within the academy. *See, e.g.,* Dan M. Kahan & Eric A. Posner, *Shaming White–Collar Criminals: A Proposal for Reform of the Federal Sentencing Guidelines,* 42 J.L. & Econ. 365, 371 (1999) (urging use of stigmatic punishments for white-collar criminals); Stephen P. Garvey, *Can Shaming Punishments Educate?,* 65 U. Chi. L.Rev. 733, 738–39 (1998);

Dan M. Kahan, *What Do Alternative Sanctions Mean?,* 63 U. Chi. L.Rev. 591 (1996) (arguing that shaming sanctions reinforce public norms against criminality). By no means is this conversation one-sided.

Criminal offenses, and the penalties that accompany them, nearly always cause shame and embarrassment. *United States v. Koon,* 34 F.3d 1416, 1454 (9th Cir.1994) ("Virtually all individuals who are convicted of serious crimes suffer humiliation and shame, and many may be ostracized by their communities."). Indeed, the mere fact of conviction, without which state-sponsored rehabilitation efforts do not commence, is stigmatic. The fact that a condition causes shame or embarrassment does not automatically render a condition objectionable; rather, such feelings generally signal the defendant's acknowledgment of his wrongdoing. *See Webster's Ninth New Collegiate Dictionary* 1081 (1986) (defining shame as "a painful emotion caused by consciousness of guilt, shortcoming, or impropriety"); *see also Gollaher,* 419 F.2d at 530. We have recognized that "the societal consequences that

Better than public expiation, he contended, would be mandatory substance abuse counseling and vocational training. First, we note that the district court *did* require Gementera to undergo substance abuse counseling and vocational training. Second, the record establishes that the district court fairly considered Gementera's claims that he was somehow particularly vulnerable to the consequences of his crime being publicly exposed. At the hearing, the court asked defense counsel, "is there some feature of his personality that makes him particularly vulnerable that you can substantiate?" The attorney replied, "I can't offer anything but my own personal observations and anecdotal observation based on my almost one-year representation of the defendant and his reaction and his family's reaction to what occurred in court." While not persuaded by the attorney's untutored lay psychological evidence, the district court nonetheless inserted a pro-

vision into the condition providing an avenue for Gementera to present more reliable evidence of psychological harm:

Upon showing by defendant that this condition would likely impose upon defendant psychological harm or effect or result in unwarranted risk of harm to defendant, the public or postal employees, the probation officer may withdraw or modify this condition or apply to the court to withdraw or modify this condition.

No such substantiation was presented. By the terms of the condition, if there were any such evidence, Gementera faces no bar to his presenting it.

12. Nor did the district court have any evidence to the contrary. By not citing these scholarly articles until this appeal, Gementera failed to provide the district court any opportunity to assess their potential value.

flow from a criminal conviction are virtually unlimited," and the tendency to cause shame is insufficient to extinguish a condition's rehabilitative promise, at least insofar as required for our flexible reasonable relation test. *Koon*, 34 F.3d at 1454.

### 3

While the district court's sandwich board condition was somewhat crude, and by itself could entail risk of social withdrawal and stigmatization, it was coupled with more socially useful provisions, including lecturing at a high school and writing apologies, that might loosely be understood to promote the offender's social reintegration. *See* Note, *Shame, Stigma, and Crime: Evaluating the Efficacy of Shaming Sanctions in Criminal Law,* 116 Harv. L.Rev. 2186 (2003) (proposing how shaming sanctions may be structured to promote social reintegration most effectively); John Braithwaite, *Crime, Shame and Reintegration* 55 (1989) ("The crucial distinction is between shaming that is reintegrative and shaming that is disinte-

grative (stigmatization). Reintegrative shaming means that expressions of community disapproval, which may range from mild rebuke to degradation ceremonies, are followed by gestures of reacceptance into the community of law-abiding citizens."). We see this factor as highly significant. In short, here we consider not a stand-alone condition intended solely to humiliate, but rather a comprehensive set of provisions that expose the defendant to social disapprobation, but that also then provide an opportunity for Gementera to repair his relationship with society—first by seeking its forgiveness and then by making, as a member of the community, an independent contribution to the moral formation of its youth.[13] These provisions,[14] tailored to the specific needs of the offender,[15] counsel in favor of concluding that the condition passes the threshold of being reasonably related to rehabilitation.

### 4

Finally, we are aware that lengthier imprisonment was an alternative available to

---

**13.** The dissent faults our analysis for looking beyond the signboard clause to other provisions of the four-part condition. [Dissent at 612.] Our purpose is not, as the dissent characterizes it, to suggest that an improper condition may be cured merely by setting it alongside proper conditions. Rather, our obligation is to assess whether an individual provision reasonably relates to the purpose of rehabilitation. Where that provision is part of an integrated rehabilitative scheme, we see no bar to looking at other aspects of the scheme in evaluating the purpose and reasonableness of the individual provision at issue. By acting in concert with others, a provision may reasonably relate to rehabilitation, even though the relation existed primarily by virtue of its interaction with complementary provisions in an integrated program. A boot camp, for example, that operates by "breaking participants down" before "building them up again" is not rendered impermissible merely because the first step, standing alone, might be impermissible. Similarly, a program that emphasizes an offenders' separa-

tion from the community of law-abiding citizens, in order to generate contrition and an authentic desire to rejoin that community, need not be evaluated without reference to the program's affirmative provisions to reconcile the offender with the community and eventually to reintegrate him into it.

**14.** We do not pass here on the more difficult case of the district court's original 100–hour condition, which lacked significant reintegrative aspects.

**15.** We do acknowledge that one purpose of the Sentencing Guidelines was to promote greater uniformity in federal sentencing, and that permitting certain conditions of supervised release, as imposed here, may lead to less regularized sentences. As described above, however, we have previously upheld a diverse array of conditions of supervised release, as contemplated by the statute's authorization of "any other condition [the district court] considers to be appropriate." 18 U.S.C. § 3583(d).

the court. The court, however, reasoned that rehabilitation would be better achieved by a shorter sentence, coupled with the additional conditions: "It would seem to me that he's better off with a taste of prison, rather than a longer prison sentence, and some form of condition of release that brings him face-to-face with the consequences of his crime." The judge's reasoning that rehabilitation would better be served by means other than extended incarceration and punishment is plainly reasonable, see Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. Chi. L.Rev. 591, 653 n. 89 ("[I]t became clear by the middle of the [19th] century that imprisonment was ill suited to rehabilitation ...." (internal citations omitted)), particularly in light of the significant economic disadvantages that attach to prolonged imprisonment. *See generally* Jeffrey Kling, Bruce Western, & David Weiman, *Labor Market Consequences of Incarceration*, 47 Crime & Delinquency 410–27 (2001) (reviewing the literature); Jeffrey Grogger, *The Effect of Arrests on the Employment and Earnings of Young Men*, 110 Quarterly J. Economics 51–72 (1995) (finding that incarcerative sentences have substantial effects on earnings in comparison with parole).

### 5

Accordingly, we hold that the condition imposed upon Gementera reasonably related to the legitimate statutory objective of rehabilitation.[16] In so holding, we are careful not to articulate a principle broader than that presented by the facts of this case. With care and specificity, the district court outlined a sensible logic underlying its conclusion that a set of conditions, including the signboard provision, but also including reintegrative provisions, would

better promote this defendant's rehabilitation and amendment of life than would a lengthier term of incarceration. By contrast, a per se rule that the mandatory public airing of one's offense can *never* assist an offender to reassume his duty of obedience to the law would impose a narrow penological orthodoxy not contemplated by the Guidelines' express approval of "any other condition [the district court] considers to be appropriate." 18 U.S.C. § 3583(d).

### III

Gementera also urges that the sandwich board condition violates the Constitution. Claims with respect to the First, Fifth, Eighth, and Fourteenth Amendments are presented.

### A

Amicus argues that the condition violates the First, Fifth, Eighth and Fourteenth Amendments. Gementera bases his appeal solely upon the Eighth Amendment, and the government contends that the additional constitutional arguments presented by the amicus have been waived.

"Generally, we do not consider on appeal an issue raised only by an amicus." *Swan v. Peterson,* 6 F.3d 1373, 1383 (9th Cir.1993). The court has considered arguments of a jurisdictional nature raised only by amici, *Stone v. San Francisco,* 968 F.2d 850, 855 (9th Cir.1992) ("Issues touching on federalism and comity may be considered sua sponte."), and it has addressed purely legal questions when the parties express an intent to adopt the arguments as their own. *United States v. Van Winrow,* 951 F.2d 1069, 1072 (9th Cir.1991) ("Because [litigant] states in his brief that he wishes to adopt [amicus'] arguments as

---

**16.** In view of this holding, we do not reach the separate issue of whether the condition reasonably relates to the objectives of deterrence and protection of the public.

his own, and because they present pure issues of law, we will consider them here."). *See also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719(9th Cir.2003) ("In the absence of exceptional circumstances, which are not present here, we do not address issues raised only in an amicus brief."); *Russian River Watershed Protection Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir.1998) (declining to address issue raised by amicus for first time on appeal when the appellee did not adopt the amicus' argument in its brief). Gementera did not adopt amicus' constitutional arguments on appeal. Though the government urged in its reply brief that these arguments had been waived, Gementera again declined to incorporate the arguments or otherwise address the waiver argument in its own reply. Accordingly, we decline to address the First, Fifth and Fourteenth Amendment claims.

### B

■ We turn then to the Eighth Amendment, which forbids the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "The basic concept underlying the Eighth Amendment was nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (finding denationalization of military deserters cruel and unusual). Consistent with human dignity, the state must exercise its power to punish "within the limits of civilized standards." *Id.*

■ A particular punishment violates the Eighth Amendment if it constitutes one of "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted." *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Shaming sanctions of far greater

severity were common in the colonial era, *see, e.g., Smith v. Doe*, 538 U.S. 84, 97–98, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003); Lawrence Friedman, *Crime and Punishment in American History* 38 (1993), and the parties do not quarrel on this point.

The Amendment's prohibition extends beyond those practices deemed barbarous in the 18th century, however. *See Stanford v. Kentucky*, 492 U.S. 361, 369–70, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). "[T]he words of the Amendment are not precise, and [ ] their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 100–01, 78 S.Ct. 590; *id.* at 100, 78 S.Ct. 590 ("Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect."). In assessing what standards have so evolved, we look "to those of modern American society as a whole," *Stanford*, 492 U.S. at 369, 109 S.Ct. 2969, relying upon "objective factors to the maximum possible extent," *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion), rather than "our own conceptions of decency." *Stanford*, 492 U.S. at 369, 109 S.Ct. 2969.

The parties have offered no evidence whatsoever, aside from bare assertion, that shaming sanctions violate contemporary standards of decency. But the occasional imposition of such sanctions is hardly unusual, particularly in our state courts. *See, e.g.,* Stephen P. Garvey, *Can Shaming Punishments Educate?*, 65 U. Chi. L.Rev. 733, 734 (1998) (describing proliferation of unorthodox and creative shaming punishments); *infra* at note 18. Aside from a

single case presenting concerns not at issue here,[17] we are aware of no case holding that contemporary shaming sanctions violate our Constitution's prohibition against cruel and unusual punishment.[18]

---

**17.** Gementera points to *Williams v. State*, 234 Ga.App. 37, 505 S.E.2d 816 (1998), in which a defendant convicted of soliciting sodomy was ordered to walk for ten days, between 7 p.m. and 11 p.m. each day, along that portion of the street where the solicitation occurred, holding a large sign stating, "BEWARE HIGH CRIME AREA." The police were to be notified in advance in order to monitor his performance and provide an appropriate level of safety. *Id.* at 817. While the court commended the trial judge for his "initiative" in developing a "new and creative form of sentencing which might very well have a positive effect on [the defendant] and be beneficial to the public," and explained that shaming punishments are not forbidden, it nonetheless found that the condition exposed the defendant to a constitutionally impermissible danger. *Id.* at 818.

The Georgia court relied upon language from *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (rejecting claim against county social services department for failing to protect child from private violence by his father), in which the Supreme Court held: "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200, 109 S.Ct. 998. The Court explained:

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200, 109 S.Ct. 998. The condition in *Gementera* does not expose the defendant to any significant risk of danger. By contrast with *Williams*, the *Gementera* signboard is worn during eight hours of daylight during the business day, not at night; in front of a United States Post Office, not a "high crime" neighborhood where criminal solicitation occurs; and the sign's message does not provoke violence by threatening the criminal livelihood of those who illegally trade sex in a red light district, as the *Williams* sign might. Moreover, the district court in *Gementera* explicitly included a provision allowing for withdrawal of the condition upon a showing that the condition would impose a safety risk upon the defendant. Gementera made no such showing.

**18.** Numerous state courts have rejected Eighth Amendment challenges to shaming sanctions. *See, e.g., People v. Letterlough*, 205 A.D.2d 803, 804, 613 N.Y.S.2d 687 (N.Y.App.Div.1994) ("CONVICTED DWI" sign on license plate); *Ballenger v. State*, 210 Ga.App. 627, 436 S.E.2d 793 (1993) (fluorescent pink DUI bracelet); *Lindsay v. State*, 606 So.2d 652, 656–57 (Fla.App.1992) (DUI advertisement in newspaper); *Goldschmitt v. State*, 490 So.2d 123, 125 (Fla.App.1986) ("Convicted DUI—Restricted License" bumper sticker); *cf. People v. McDowell*, 59 Cal.App.3d 807, 812–13, 130 Cal.Rptr. 839 (Cal.App.1976) (tap shoes for purse thief who used tennis shoes to approach his victims quietly and flee swiftly). *See also Developments in Law: Alternatives to Incarceration*, 111 HARV. L. REV.1944, 1953 (1998) ("Eighth Amendment challenges have also failed to overturn shaming conditions, despite arguments that 'modern scarlet-letter probation conditions constitute punishment in and of themselves' and that certain shaming conditions impose psychological cruelty while yielding no better results than conventional punishments."); *id.* at 1953, 130 Cal.Rptr. 839 ("Courts have simply adopted the reasoning that shaming is not cruel or unusual when the alternative is imprisonment."); Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. Chi. L.Rev. 591, 646 n. 226 (1996) ("Although the doctrine is exceedingly indeterminate, it seems fairly obvious that shaming penalties are not 'cruel and unusual' for purposes of the Eighth Amendment, particularly when the alternative is imprisonment.").

---

We do, however, note that *Blanton v. N. Las Vegas*, 489 U.S. 538, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989), is instructive, if only indirectly. In *Blanton*, the Court considered whether a Nevada DUI defen-

dant was entitled to a jury trial pursuant to the Sixth Amendment. The inquiry into whether the offense constituted a petty crime not subject to the Sixth Amendment trial provision required the Court to evaluate the severity of the maximum authorized penalty. *Id.* at 541, 109 S.Ct. 1289. The statute provided a maximum sentence of six months or, alternatively, forty-eight hours of community service while dressed in distinctive garb identifying the defendant as a DUI offender, payment of a $200–$1000 fine, loss of driving license, and attendance at an alcohol abuse course. *Id.* at 539–40, 109 S.Ct. 1289. The Court wrote:

> We are also unpersuaded by the fact that, instead of a prison sentence, a DUI offender may be ordered to perform 48 hours of community service dressed in clothing identifying him as a DUI offender. Even assuming the outfit is the source of some embarrassment during the 48–hour period, such a penalty will be less embarrassing and less onerous than six months in jail.

*Id.* at 544, 109 S.Ct. 1289; *but see id.* at 544 n. 10 ("We are hampered in our review of the clothing requirement because the record from the state courts contains neither a description of the clothing nor any details as to where and when it must be worn."). Just as the Court concluded that 48 hours of service dressed in distinctive DUI garb was less onerous than six months imprisonment, it would stretch reason to conclude that eight hours with a signboard, in lieu of incarceration, constitutes constitutionally cruel and unusual punishment.

In the absence of any evidence to the contrary, and particularly in comparison with the reality of the modern prison, we simply have no reason to conclude that the sanction before us exceeds the bounds of "civilized standards" or other "evolving standards of decency that mark the progress of a maturing society." *Trop,* 356 U.S. at 100–01, 78 S.Ct. 590.

**AFFIRMED.**

HAWKINS, Circuit Judge, dissenting:

Conditions of supervised release must be reasonably related to and "involve no greater deprivation of liberty than is reasonably necessary" to deter criminal conduct, protect the public, and rehabilitate the offender. *See* 18 U.S.C. §§ 3553(a)(1)-(2); 3583(d)(2); *United States v. Williams,* 356 F.3d 1045, 1056 (9th Cir.2004). Clearly, the shaming punishment[1] at issue in this case was intended to humiliate Gementera. And that is all it will do. Any attempt to classify the goal of the punishment as anything other than humiliation would be disingenuous.[2] Because humiliation is not one of the three proper goals under the Sentencing Reform Act,[3] I

---

1. One scholar has defined a "shaming" punishment as "marked by two features: first, there is an attempt to debase, degrade, or humiliate the offender; and second, the degradation occurs before the public eye, often but not always with the aid of the public." Dan Markel, *Are Shaming Punshments Beautifully Retributive? Retributivism and the Implications for the Alternative Sanctions Debate,* 54 Vand. L.Rev. 2157, 2178 (Nov.2001). This condition—requiring Gementera to wear a sandwich board outside a public post office declaring his crime—clearly qualifies as a "shaming" punishment.

2. The district judge was forthright in his statement regarding why he imposed the condition: "[Gementera] needs to understand the disapproval that society has for this kind of conduct, and that's the idea behind the humiliation."

3. The three goals are deterrence, rehabilitation, and protection of the public. 18 U.S.C. §§ 3553(a)(2).

would hold that the district court abused its discretion in imposing the condition.

There is precious little federal authority on sentences that include shaming components, perhaps indicative of a recognition that whatever legal justification may be marshaled in support of sentences involving public humiliation, they simply have no place in the majesty of an Article III courtroom. Some state courts have reviewed such sentences and the results have been mixed.

*People v. Hackler,* 13 Cal.App.4th 1049, 16 Cal.Rptr.2d 681, 686–87 (1993), involved a condition that required a shoplifting offender to wear a court-provided t-shirt whenever he left the house that read: "My record plus two six-packs equals four years" on the front and "I am on felony probation for theft" on the back. Applying a state sentencing regime similar to the federal guidelines—authorizing the imposition of reasonable conditions of probation to foster rehabilitation and to protect public safety—the court struck down the condition. *Id.* at 686, 13 Cal.App.4th 1049. The court held that the relationship between the required conduct (wearing the t-shirt) and the defendant's crime (stealing beer) was so incidental that it was not reasonable and that the true intent behind the condition was to expose Hackler to "public ridicule and humiliation" and not "to foster rehabilitation." *Id.* at 686–87, 13 Cal.App.4th 1049.

As in Hackler's case, the purpose behind the sandwich board condition was not to rehabilitate Gementera, but rather to turn him into a modern day Hester Prynne.[4] This sort of condition is simply improper under the Sentencing Reform Act. *See also Springer v. United States,* 148 F.2d 411, 415–16(9th Cir.1945) (invalidating a condi-

tion that a convicted draft dodger donate a pint of blood to the Red Cross).

*Ballenger v. State,* 210 Ga.App. 627, 436 S.E.2d 793 (1993), approved a condition that a convicted drunk driver wear a fluorescent pink identification bracelet identifying him as such. By my lights, the dissent in *Ballenger* is far more persuasive. Concluding that the purpose of the condition was clearly to humiliate, Judge Blackburn argued that "a rationale of rehabilitation may not be used to vest ... authority[to prescribe this type of punishment] in the judiciary." *Id.* at 795–96 (Blackburn, J. dissenting).

Just as in *Hackler* and *Ballenger,* the true intention in this case was to humiliate Gementera, not to rehabilitate him or to deter him from future wrongdoing. When the district court initially imposed the sandwich board condition, the judge explained that Gementera should have to suffer the "humiliation of having to stand and be labeled in front of people coming and going from a post office as somebody who has stolen the mail." Subsequently, Gementera filed a motion to correct the sentence by having the sandwich board condition removed. He urged that humiliation was not a legitimate objective of punishment or release conditions. Only at the hearing on Gementera's motion did the district court change its characterization of the shaming punishment, remarking that the punishment was one of deterrence and rehabilitation and not merely humiliation.

Although the majority opinion initially seems to accept the district court's retroactive justification for the punishment, it later as much as concedes that the sandwich board condition amounted to a shaming punishment. Admitting that the condition was "crude" and "could entail risk of social withdrawal and stigmatization," the

---

4. *See* Hawthorne, *The Scarlet Letter; Hackler,* 16 Cal.Rptr.2d at 686.

majority nonetheless finds the condition acceptable because it was "coupled with more socially useful provisions." [Op. at 606] Put another way, the majority says that it is not considering "a stand-alone condition intended soley to humiliate, but rather a comprehensive set of conditions." [Op. at 606] But the majority cites to no provision in the Sentencing Reform Act and to no case law indicating that conditions on supervised release should be reviewed as a set and not individually, or that humiliation somehow ceases to be humiliation when combined with other punishment. *Cf. United States v. Eyler,* 67 F.3d 1386, 1393–94 (9th Cir.1995) ("*Any* discretionary condition must meet each of the three broad conditions set forth in [the Sentencing Reform Act]." (emphasis added)). The majority's position seems to be that even if one condition of a sentence manifestly violates the Sentencing Act, it can be cured by coupling the provision with other, proper ones. When such a novel proposition is put forward and no case law is cited to support it, there is usually a reason. At the end of the day, we *are* charged with evaluating a condition whose primary purpose is to humiliate, and that condition should simply not be upheld.

Although I believe that the sandwich board condition violates the Sentencing Reform Act and we should reverse the district court for that reason, I also believe that this is simply bad policy. A fair measure of a civilized society is how its institutions behave in the space between what it may have the power to do and what it should do. The shaming component of the sentence in this case fails that test. "When one shames another person, the goal is to degrade the object of shame, to place him lower in the chain of being, to dehumanize him." [5]

5. Markel, supra note 1 at 2179.

To affirm the imposition of such punishments recalls a time in our history when pillories and stocks were the order of the day. To sanction such use of power runs the very great risk that by doing so we instill "a sense of disrespect for the criminal justice system" itself. *Ballenger,* 436 S.E.2d at 796 (Blackburn, J. dissenting).

I would vacate the sentence and remand for re-sentencing, instructing the district court that public humiliation or shaming has no proper place in our system of justice.